IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ROBIN WELLS-DEFLEICE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.  3:13-CV-1279-BH |
| | § | |
| CAROLYN W. COLVIN, ACTING | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | Consent Case |

## MEMORANDUM OPINION AND ORDER

By order filed June 6, 2013, this matter has been transferred for the conduct of all further proceedings and the entry of judgment.  Before the Court is *Plaintiff's Brief in Support of Claim*, filed July 1, 2013 (doc. 28).  Based on the relevant filings, evidence, and applicable law, the Commissioner's decision is wholly **AFFIRMED.**

## I.  BACKGROUND[1]

### A.    Procedural History

Robin Wells-Defleice (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claim for disability insurance benefits (DIB) under Title II of the Social Security Act.  (R. at 4–6.)  On March 22, 2010, Plaintiff applied for DIB, alleging disability beginning on February 26, 2010, due to bipolar disorder and alcohol and drug addiction.  (R. at 227–30, 257.)  Her application was denied initially and upon reconsideration.  (R. at 144–56.)  Plaintiff requested a hearing before an Administrative Law Judge (ALJ), and she

---

[1]    The background information is summarized from the record of the administrative proceedings, which is designated as "R."

personally appeared and testified at a hearing held on July 19, 2011.  (R. at 34–92.)  On January 27,

2012, the ALJ issued his decision finding Plaintiff not disabled.  (R. at 19–29.)  Plaintiff requested

review of the ALJ's decision, and the Appeals Council denied her request on January 11, 2013,

making the ALJ's decision the final decision of the Commissioner.  (R. at 4–6.)  She timely appealed

the Commissioner's decision under 42 U.S.C. § 405(g).  (doc. 1.)

## B.    Factual History

### 1.    Age, Education, and Work Experience

Plaintiff was born on April 29, 1958; she was 53 years old at the time of the hearing before

the ALJ.  (R. at 39.)  She has a general equivalency degree (GED) and past relevant work as a

customer service representative, telephone order clerk, data entry clerk, general clerk, and

salesperson of general merchandise.  (R. at 39, 52–55, 399, 470–74.)

### 2.    Psychological and Psychiatric Evidence[2]

On October 10, 2008, Plaintiff presented to ABC Behavioral Health, LLC, for a

psychological evaluation.  (R. at 359.)  She was diagnosed with bipolar disorder, mixed episodes,

moderate severity, and was assigned a Global Assessment of Functioning (GAF) score of 40.[3]  (*Id.*)

Plaintiff saw Tamella Jo Trulson, M.D., a psychiatrist at ABC Behavioral, on January 12,

2009.  (R. at 360–61.)  A "mental status exam" revealed that she was well-groomed, friendly, and

relaxed; her attention, concentration, insight, and judgment were "intact"; she was oriented, her

---

[2] The record does not contain any medical evidence; only Plaintiff's mental impairments are at issue.

[3] GAF is a standardized measure of psychological, social, and occupational functioning used in assessing a patient's mental health.  *Boyd v. Apfel*, 239 F.3d 698, 700 n. 2 (5th Cir. 2001).  A GAF score of 31 to 40 represents some impairment in reality testing or communication or a major impairment in several areas, such as work, school, family relations, judgment, thinking, and inability to work.  *American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* ("DSM–IV–TR") p. 34 (4th ed. 1994).

short- and long-term memory was intact; her affect was congruent; her thought process was "well-organized"; her judgment and insight were "fair"; her mood was euthymic (within the normal range of emotions, neither depressed nor highly elevated);[4] and the rate and tone of her speech were normal. (*Id.*) A mental status exam conducted a month later was the same, except that her mood was "irritable." (R. at 362.)

On March 4, 2010, Plaintiff presented to Dallas Metrocare Services (Metrocare) for a "Psychiatric Diagnostic Interview Exam." (R. at 365–71.) Kevin Johnson, a Metrocare clinician, diagnosed her with bipolar disorder and assigned her a GAF score of 50.[5] (R. at 365.) The clinician found that Plaintiff was "withdrawn and isolated", but she showed "no evidence of any impulsive or abusive behaviors" and had no suicidal or homicidal ideations. (*Id.*) Plaintiff told him that she had "been dealing" with her bipolar disorder "all her life", and her symptoms included sadness, hypersomnia, increased appetite, social isolation, feelings of hopelessness, mood swings, irritability, racing thoughts, and manic episodes lasting up to three days. (R. at 370.) A mental status exam showed that Plaintiff's psychomotor activity and speech were normal, she showed no signs of psychotic features, she was alert and oriented, her memory was intact, her attention was normal, and her affect was euthymic. (*Id.*)

When Plaintiff returned two weeks later, she stated being "okay" and "still the same." (R. at 373.) She was sleeping "okay" and her appetite was "normal." (R. at 374.) A mental status exam revealed she was neatly dressed, her mood was pleasant, she was oriented, and her speech was normal. (R. at 430–31.) She stated that she wanted to pursue a "nursing degree." (R. at 431.)

---

[4] Medical Dictionary, http://medical-dictionary.thefreedictionary.com/euthymic (last visited April 21, 2014).

[5] A GAF score of 40 to 50 represents serious symptoms, such as suicidal ideations and severe obsessional rituals, or a major impairment in several areas, such as work and school. DSM at 34.

During a therapy session on April 13, 2010, clinician Johnson taught Plaintiff skills regarding stress management, conflict resolution, and fostering supportive relationships. (R. at 381–82.) She was not yet "stabilized on [her] medications" and wanted "to get things under control." (R. at 382.) She told the clinician that she was living in a homeless shelter and could not keep a job due to her bipolar symptoms. (R. at 436.)

On June 14, 2010, Jean Germain, Ph.D., a state agency psychological consultant (SAMC), reviewed Plaintiff's treatment records and completed a Psychiatric Review Technique Form (PRTF) and a consultative mental Residual Functional Capacity (RFC) assessment. (R. at 383–99.) In the PRTF, Dr. Germain compared Plaintiff's bipolar disorder to listing 12.04 for "affective disorders." (R. at 383.) She opined that Plaintiff had mild limitations in her activities of daily living and social functioning; had moderate limitations in maintaining concentration, persistence, and pace; and had experienced no episodes of decompensation of extended duration. (R. at 393.) She concluded that Plaintiff was "somewhat restricted" by her symptoms, but she was not "wholly compromised in [her] ability to function in a work setting." (R. at 395.)

In her mental RFC assessment, Dr. Germain opined that Plaintiff was not significantly limited in 14 work-related mental abilities, including the ability to understand, remember, and carry out very short and simple instructions, and was moderately limited in 6 abilities, including the ability to understand, remember, and carry out detailed instructions and maintain attention and concentration for extended periods. (*Id.*) Dr. Germain concluded that Plaintiff had the mental RFC to "understand, remember, and carry out detailed, non-complex instructions, attend and concentrate for extended periods, accept instructions, and respond appropriately to changes in a routine work setting." (R. at 399.) A few months later, Margaret Meyer, M.D., another SAMC, "affirmed as

written" all of Dr. Germain's findings.  (R. at 414.)

On June 23, 2010, Dr. Trulson examined Plaintiff and completed a psychiatric evaluation. (R. at 505.)  Plaintiff was well-groomed, friendly, and relaxed; her attention, concentration, insight, and judgment were "intact"; she was oriented, her short- and long-term memory was intact; her affect was congruent; and her thought process was "well-organized."  (*Id.*)  Plaintiff was depressed and irritable, but had no suicidal or homicidal ideations.  (*Id.*)  Dr. Trulson noted that Plaintiff had "occupational, housing, and economic" stressors.  (R. at 506.)

Between July 23 and August 25, 2010, Plaintiff saw Dr. Trulson on seven different occasions and her mental status exams were essentially the same as the one from June.  (*See* R. at 405–06, 493–504.)  By July 30, 2010, her anxiety had improved, and her sleep was "good."  (R. at 406.)  She was "depressed" on August 9, 2010.  (R. at 499.)

Plaintiff had another psychological assessment at Metrocare on September 17, 2010.  (R. at 475–82.)  Her symptoms included depression, anxiety, panic attacks, racing thoughts, difficulty concentrating, and "easy distraction."  (R. at 475.)  Clinician Silvester Mayes recommended that she continue her mental health treatment.  (R. at 475–82.)

Between September 22, and December 12, 2010, Plaintiff saw Dr. Trulson five times.  (R. at 483–92.)  Her mental status exams remained unchanged.  (*See id.*)

On January 1, 2011, Plaintiff's mental status exam was the same as before, except that her mood was anxious, and she was having auditory and visual hallucinations.  (R. at 352.)  That day, Plaintiff also complained of insomnia, irritability, and the inability to "filter" out the noises around her.  (R. at 353.)  Two weeks later, her mental status exam was essentially the same, but her judgment and insight were only "fair."  (R. at 454.)

Dr. Trulson completed a standardized questionnaire regarding Plaintiff's symptoms on February 16, 2011. (R. at 416–19.) She indicated that Plaintiff had been under her care since 2008. (R. at 417.) Plaintiff's diagnosis was bipolar disorder I. (*Id.*) Despite her compliance, Plaintiff "continue[d] to have residual/recurrent symptoms." (*Id.*) Dr. Trulson indicated that Plaintiff experienced 13 of the 56 listed symptoms, including anxiety, mood disturbance, difficulty thinking and concentrating, psychomotor agitation, emotional lability, and flight of ideas. (R. at 418.)

That day, Dr. Trulson also completed a mental status exam and indicated that Plaintiff was well-groomed; her motor activity and speech were within normal limits; her orientation, attention, concentration, and memory were "intact"; her thought process was "goal oriented"; her thought content was normal; her insight and judgment were "good"; her affect was "congruent"; and her mood was "anxious." (R. at 419.) According to Dr. Trulson, Plaintiff did not "appear to be falsifying or exaggerating her symptoms", and her symptoms did not "appear to be primarily due to substance abuse/dependency." (*Id.*) She assigned Plaintiff a GAF score of 50 and issued a "guarded" prognosis. (R. at 417, 419.)

Between March 16 and July 25, 2011, Plaintiff saw Dr. Trulson at least six times. (R. at 348–49, 444–51.) On all six occasions, her mental status exams were almost the same as the previous times. (*Id.*) On May 11, June 8, and June 11, 2011, her mood was anxious, however. (R. at 348, 444, 446.) On June 8, she also complained of feeling "sedated" from her medications. (R. at 445.) On July 25, Dr. Trulson "change[d] her diagnosis to schizo-affective disorder" and adjusted her medications. (R. at 351.)

At the ALJ's request, Glen E. McClure, Ph.D., a psychological expert, reviewed Plaintiff's treatment notes and completed "interrogatories" on July 28, 2011. (R. at 516–20.) He opined that

Plaintiff was mildly limited in her activities of daily living, social functioning, and maintaining concentration, persistence, and pace, and had not experienced any episodes of extended duration. (*Id.*)  He noted her history of polysubstance abuse but saw "no evidence of an addiction problem[] in [her] records."  (*Id.*) He determined that Plaintiff's bipolar disorder was "manifested by the full symptomatic picture of both manic and depressive syndromes", but it did not meet the severity criteria of any disorder listed in the regulations.  (*Id.*)  He concluded that Plaintiff had the mental RFC to "understand, remember, and carry out detailed but not complex instructions."  (*Id.*)

On August 3, 2011, Dr. Trulson submitted a disability letter.  (R. at 355.)  She indicated that Plaintiff had "been under [her] psychiatric medication management care since November of 2008." (*Id.*)  Although she initially diagnosed Plaintiff with bipolar disorder I, she now believed that schizoaffective disorder "better describe[d] the nature, severity, and duration of her chronic psychotic and mood symptoms."  (*Id.*)  According to Dr. Trulson, despite Plaintiff's medical compliance, there was "great difficulty finding psychotropic medications that diminish[ed] her symptoms" in part because she experienced "intolerable side effects to many medications."  (*Id.*) Plaintiff "continue[d] to suffer greatly [from] hallucinations, anxiety, poor concentration, and insomnia."  (*Id.*)  She opined that it was "highly unlikely" that Plaintiff could obtain or maintain employment at any skill level, and she did not believe that Plaintiff would gain a "substantial restoration of function."  (*Id.*)

On August 8, 2011, Mark E. Cartwright, Ph.D., a licensed psychologist and consultative examiner for disability determination services, interviewed Plaintiff and completed a "medical source statement of ability to do [mental] work-related activities."  (R. at 521–32.)  Although Plaintiff was "cooperative and well motivated" during the interview, she "often talked fast and

seemed rushed." (R. at 524.) Her chief complaints were "suspected bipolar disorder" and "alcohol and drug abuse." (*Id.*) Her symptoms included racing thoughts, manic mood states, confusion, and panic attacks. (*Id.*) "She report[ed] that her manic symptoms ha[d] worsened" over time. (*Id.*) She had suicidal ideations but had not attempted suicide "to date." (*Id.*)

Plaintiff told Dr. Cartwright that during her manic episodes, she talked incessantly, had racing thoughts, and felt irritable and confused. (*Id.*) "She report[ed] feeling tired, irritable, and lethargic", and being occasionally depressed. (*Id.*) She heard voices that made her "extremely agitated and annoyed" and felt "that bugs [were] crawling on her." (*Id.*) Although she had abused drugs in the past, she had been sober since September 2005. (*Id.*)

Plaintiff reported that she last worked in February 2010 and was "laid off due to her poor performance." (*Id.*) Her efforts to find other work were unsuccessful due to her criminal history and "problems maintaining focus and attention in the workplace." (*Id.*) She struggled with her daily living activities because she had recurrent panic attacks. (*Id.*) She spent "her average day in her room" and "sometimes clean[ed] around [her] transitional home." (R. at 525–26.) She was "not a social individual" and had "only one friend." (R. at 526.)

Based on a "Wechsler Adult Intelligence Scale" test, Dr. Cartwright found that Plaintiff's "general cognitive," thinking, and "nonverbal" reasoning abilities were "in the borderline range and above those of only 3 percent of her peers." (R. at 526–28.) Her "ability to sustain attention, concentrate, and exert mental control [was] in the borderline range." (*Id.*) She also "had difficulty . . . attending and holding information in short-term memory." (*Id.*)

Dr. Cartwright opined that Plaintiff had mild limitations in six mental work-related abilities, including understand, remember, and carry out simple instructions; had moderate limitations in three

abilities, including understand, remember, and carry out complex instructions; and had a marked limitation in her ability make judgments on complex work-related decisions. (R. at 521–22.) He diagnosed her with bipolar disorder, past history of polysubstance dependence, and borderline cognitive functioning. (R. at 530.) He found that her psychosocial stressors were her unemployment, criminal and drug history, and poor social network. (*Id.*) He opined that she should "continue with her treatment program" and "should continue to attempt to find employment . . . so she [could] provide for herself financially." (R. at 531.)

**3.**     **Hearing Testimony**

On July 19, 2011, Plaintiff, Jacqueline Benson (Plaintiff's case manager from ABC Behavioral), and a vocational expert (VE) testified at a hearing before the ALJ. (R. at 34–92.) Plaintiff was represented by an attorney. (R. at 34.)

**a.**     *Plaintiff's Testimony*

Plaintiff testified that she had a GED and no college or vocational education. (R. at 39–40.) She last worked in 2009 as a customer service representative answering phones. (R. at 40.) She applied for other work without success after being laid off. (*Id.*) She did not receive unemployment benefits. (*Id.*) She could not work full time because she was unable to "follow directions" and had poor concentration. (R. at 41–42.) She could not focus due to her "racing thoughts." (R. at 42.) She had "too many thoughts . . . at the same time" and could not "stick to one thing"; she was "all over the place." (*Id.*) Although her thoughts did not pertain to any particular subject, she often thought of people and "inventing" things. (R. at 43.)

Plaintiff first received psychiatric treatment in 2005. (R. at 44.) She sought treatment because she was manic and later became very depressed and "wanted to kill [her]self." (*Id.*) When

she was depressed, she "felt like [she] was walking through mud."  (R. at 45.)  She had received

psychological treatment at ABC Behavioral since June 2010.  (R. at 40.)  ABC Behavioral paid her

rent, and she also received food stamps.  (R. at 41.)

The longest Plaintiff ever held a job was three and a half years, when she worked for a

"family business" taking orders, 25 years earlier.  (R. at 45.)  In the past 15 years, the longest she

stayed at a job was one year and five months, when she worked for a commercial real estate

company in Cleveland, Ohio.  (R. at 45–46.)  She answered the phone and assisted with routine

duties, such as ordering supplies and organizing documents.  (R. at 46.)  She stopped working there

because she was "laid off."  (*Id.*)[6]

### b.      Case Manager's Testimony

Plaintiff's case manager testified that she had worked at ABC Behavioral for two and a half

years.  (R. at 66.)  She had been "involved" in Plaintiff's mental health treatment for a year and a

half.  (R. at 67.)  She "put together a treatment plan that best suit[ed] [Plaintiff's] needs."  (R. at

68–69.)  She observed her symptoms and reported them to Dr. Trulson, the psychiatrist.  (R. at 69.)

According to the case manager, Plaintiff had difficulty concentrating and communicating

effectively.   (R. at 69.)  In addition, she was withdrawn and lacked interpersonal skills.  (*Id.*)

Although she had "symptoms of mani[a] and depression," she was "more manic than depressed."

(R. at 70.)  She also suffered from anxiety and auditory hallucinations.  (*Id.*)

It was the case manager's opinion that Plaintiff had obsessive compulsive disorder (OCD)

"as far as cleaning and communicating [] with others."  (*Id.*)  During her home visits with Plaintiff,

she "reinforce[d]" activities of daily living and taught her communication skills.  (*Id.*) Plaintiff's

---

[6] At this point, the ALJ and Plaintiff's attorney reviewed Plaintiff's treatment notes from Metrocare and ABC Behavioral and discussed Dr. Trulson's February 26, 2011 questionnaire.  (R. at 49–51.)

obsessive cleaning habits affected her daily living and interfered with her treatment.  (R. at 71–72.)

During her manic episodes, Plaintiff became angry and frustrated.  (R. at 72–73.)  When she had a panic attack, which was three or four times a week, she was "unable to communicate," hyper-ventilated, felt as if she was having a heart attack, and sometimes went to the emergency room because she felt overwhelmed.  (R. at 73.)

Dr. Trulson had difficulty finding the right combination of medications for Plaintiff because she could not accurately describe her symptoms and cycled between manic and depressive episodes unpredictably.  (R. at 74.)  Some medications did not have any effect on her symptoms.  (*Id.*)  Although Klonopin helped with her symptoms, it was "too sedating" at the optimal dose.  (R. at 75–76.)  She also experienced "tactile hallucinations," meaning that she saw and felt "bugs either crawling on her skin or floating above her skin."  (*Id.*)

The case manager monitored Plaintiff's medications to ensure she took the proper doses at the right time.  (R. at 78.)  Plaintiff lacked interpersonal skills and did not "like being around a large group of individuals."  (R. at 79.)  She had "paranoid delusions" and thought that people were talking about her or looking at her.  (R. at 80–81.)  When she was depressed, she "hit[] rock bottom" and isolated herself.  (R. at 82.)  Although she attended  therapy groups, she did not interact much. (*Id.*)  The case manager had to "redirect" her responses during their conversations.  (R. at 84.)

**c.      *VE's Testimony***

The VE classified Plaintiff's past relevant work as customer service representative (sedentary, SVP 3 and 4), telephone order clerk (sedentary, SVP-4), data entry clerk (sedentary, SVP-3), general clerk (light, SVP-3), and sales person of "general merchandise" (light, SVP-3). (R. at 52–55.)  The ALJ asked the VE to opine whether a hypothetical person with Plaintiff's age,

-11-

education, and work experience could perform her past relevant work if she had the following RFC: "no physical limitations"; understand, remember, and carry out detailed, non-complex instructions; attend and concentrate for extended periods; accept instructions; respond appropriately to changes in a routine work setting; and perform "semi-skilled" work with SVP levels of 3 and 4.  (R. at 56–57.)  The VE opined that the hypothetical person would not be able to perform Plaintiff's past relevant work.  (R. at 59.)  He explained that according to Dr. Germain's consultative PRTF, Plaintiff was "moderately limited" in her ability to remember detailed instructions, meaning that she could not perform semi-skilled work, and all of her past work was semi-skilled.  (R. at 59–60.)  In response to the ALJ's question, the VE stated that the hypothetical person "would have difficulty" performing Plaintiff's past relevant work as a telephone order clerk.  (R. at 59.)  In his opinion, the hypothetical person could perform "unskilled work."  (R. at 60.)

C.    **ALJ's Findings**

The ALJ issued his decision denying benefits on January 27, 2012.  (R. at 18–29.)  At step one, he found that Plaintiff had not engaged in substantial gainful activity (SGA) since her alleged onset date of February 26, 2010.  (R. at 20.)  At step two, he found that Plaintiff had two severe impairments: depression with a past history of substance abuse in remission and borderline cognitive functioning.  (*Id.*) Despite those impairments, at step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled any impairment listed in the regulations.  (R. at 23–24.)

Before proceeding to step four, the ALJ determined that Plaintiff had the RFC to "perform a full range of work at all exertional levels" and "understand, remember, and carry out detailed but not complex instructions."  (R. at 25.)  At step four, he found that Plaintiff could perform her past

relevant work as a customer service telephone clerk.  (R. at 28.)  The ALJ therefore concluded that Plaintiff was not disabled, as the term is defined under the Social Security Act, at any time between her alleged onset date and the date of the ALJ's decision.  (R. at 29.)

## II. ANALYSIS

A.   <u>Legal Standards</u>

1.     **Standard of Review**

Judicial review of the commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(c)(3).  Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence supports the Commissioner's decision. *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985).  Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those

governing the determination under a claim for supplemental security income. *See Id.*  The Court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision. *Id.*

### 2.    Disability Determination

To be entitled to social security benefits, a claimant must prove he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988).  The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 189, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" will not be found to be disabled.

4. If an individual is capable of performing the work he had done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R. § 404.1520(b)-(f)) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)).  Under the first four steps

of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564.  The

analysis terminates if the Commissioner determines at any point during the first four steps that the

claimant is disabled or is not disabled. *Id.*  Once the claimant satisfies his or her burden under the

first four steps, the burden shifts to the Commissioner at step five to show there is other gainful

employment available in the national economy that the claimant is capable of performing.

*Greendspan*, 38 F.3d at 236.  This burden may be satisfied either by reference to the Medical-

Vocational Guidelines of the regulations, by vocational expert testimony, or other similar evidence.

*Froga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  A finding that a claimant is not disabled at

any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813

F.2d 55, 58 (5th Cir. 1987).

**3.      Standard for Finding of Entitlement to Benefits**

In the alternative to remand, Plaintiff asks the Court to "reverse the ALJ's decision and

remand for an award of benefits." (Pl. Br. at 8.)

If an ALJ's decision is not supported by substantial evidence, the case may be remanded

"with the instruction to make an award if the record enables the court to determine definitively that

the claimant is entitled to benefits." *Armstrong v. Astrue*, No. 1:08-CV-045-C, 2009 WL 3029772,

at *10 (N.D. Tex. Sept. 22, 2009). The claimant must carry "the very high burden of establishing

'disability without any doubt.'" *Id.* at *11 (citation omitted).  The Commissioner, not the court,

resolves evidentiary conflicts. *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).  Inconsistencies

and unresolved issues in the record therefore preclude an immediate award of benefits. *Wells v.

Barnhart*, 127 F. App'x 717, 718 (5th Cir. 2005) (per curiam).

B.     **Issues for Review**

Plaintiff presents two issues for review:

(1) Whether the ALJ committed reversible error by failing to address the hearing testimony of Plaintiff's case manager in accordance with 20 C.F.R. § 404.1513(d) and SSR 06-03p.; [and]

(2) Whether the ALJ violated 20 C.F.R. § 1527(b) and SSR 96-5p by failing to address the medical source statement of Plaintiff's treating physician.

(Pl. Br. at 1.)

C.     **Case Manager's Testimony**

Plaintiff contends that remand is required because the ALJ erred by failing to consider or even address in his written opinion the testimony of Ms. Jacqueline Benson, her case manager from ABC Behavioral, in determining her mental RFC.  (Pl. Br. at 4.)

Pursuant to the regulations, only opinions from "acceptable medical sources"[7] may be used to establish the existence of a medically determinable impairment.  20 C.F.R. § 404.1513(a)(2) (2013); *Porter v. Barnhart*, 200 F. App'x 317, 319 (5th Cir. 2006) (per curiam).  The ALJ "*may* also use evidence from other sources[8] to show the severity of [the claimant's] impairment and how it affects [her] ability to work."  20 C.F.R. § 404.1513(d) (emphasis added).  Ruling 06-03p explains that opinions from "other sources" "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file."  SSR 06-03p, 2006 WL 2329939, at *3.  The ruling further provides:

---

[7]  Acceptable medical sources include licensed physicians or osteopathic doctors, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists.  20 C.F.R. § 404.1513(a).

[8]  Nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists are examples of "other medical sources."  20 C.F.R. § 404.1513(d)(1).  Other "non-medical sources" include "public and private social welfare agency personnel [and] rehabilitation counselors."  Social Security Ruling (SSR) 06–03p, 2006 WL 2329939, at *2 (S.S.A. 2006).

Since there is a requirement to consider all relevant evidence in an individual's case record, the case record *should reflect* the consideration of opinions from medical sources who are not "acceptable medical sources" . . . who have seen the claimant in their professional capacity. Although there is a distinction between what an [ALJ] *must consider* and what the [ALJ] *must explain* in [his] decision [], the [ALJ] generally *should explain* the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the [] decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, *when such opinions may have an effect on the outcome of the case.*

*Id.* at *7 (emphasis added). As stated in SSR 06-03p, "there is an undefined but apparent distinction between which pieces of evidence *must be* used, considered, evaluated, and/or explained versus what evidence *should be* explained." *Black v. Colvin*, No. 2:12-CV-0233, 2014 WL 1116682, at *4–5 (N.D. Tex. Mar. 20, 2014) (emphasis in original) (citing SSR 06-03p, 2006 WL 2329939, at *7).

Without referencing SSR 06-03p, the Fifth Circuit held in *Porter* that the ALJ "did not err by failing to consider the opinion of . . . [the claimant's] chiropractor" because "a chiropractor is not listed as an acceptable medical source." *Porter*, 200 F. App'x at 319.[9] In *Black*, the district court noted the ruling's apparent distinction between the evidence that "must" and "should" be considered, and rejected the "plaintiff's black-and-white interpretation" that would require the ALJ to consider the "vocational report" of a non-medical "other source." *See Black*, 2014 WL 1116682, at *4–5.[10]

---

[9] This is consistent with the well-established principle in this circuit that "an RFC determination can be supported by substantial evidence even if the ALJ does not specifically discuss all the evidence that he rejected." *Ruiz v. Astrue*, No. 3:11-CV-1706-BH, 2012 WL 4512112, at *18 (N.D. Tex. Sept. 30, 2012); *see also Falco v. Shalala*, 27 F.3d 160, 163–64 (5th Cir. 1994) (declining to adopt a rule that would require the ALJ to identify all of the evidence supporting the disability determination and provide reasons for rejecting all other evidence); *Penalver v. Barnhart*, No. SA–04–CA–1107–RF, 2005 WL 2137900, at *6 (W.D. Tex. July 13, 2005) ("The ALJ may not have discussed all of the evidence in the record to the extent desired by Plaintiff, but the ALJ is only required to make clear the basis of his assessment-he need not discuss all supporting evidence or evidence rejected."); *Jefferson v. Barnhart*, 356 F. Supp.2d 663, 675 (S.D. Tex. Mar.12, 2004) ("[I]n interpreting the evidence and developing the record, the ALJ need not discuss every piece of evidence.").

[10] In contrast, at least one district in this circuit has held that an ALJ's failure to consider evidence from "other sources" contravenes SSR 06–03p and may constitute grounds for reversal. *See Fontenot v. Comm'r of Soc. Sec.*, No. CIV.A. 11-0909, 2013 WL 395827, at *7 (W.D. La. Jan. 7, 2013), *rec. adopted*, 2013 WL 416300 (W.D. La. Jan. 30, 2013) ("The undersigned finds that the Commissioner should have considered the records from the nurse practitioner in assessing the severity of claimant's impairments and how they affected her ability to work."); *Morvan v. Astrue*, No.

As a counselor, Plaintiff's case manager was not an acceptable medical source.  *See* 20 C.F.R. § 404.1513(d).  Her opinions were therefore not "medical opinions" and could not be used to establish the existence of a medically determinable impairment.  *See* 20 C.F.R. § 404.1527(a)(2).  Accordingly, the ALJ was not required to give her opinions any weight.  *See Hayes v. Astrue*, No. 3:11–CV–1998–L, 2012 WL 4442411, at *3 (N.D. Tex. Sept.26, 2012) (explaining that "the ALJ was not required to give [a nurse's] opinions any weight" because she was "not an 'acceptable medical source'").

Even assuming, without deciding, that the absence of any reference to the case manager's testimony in the ALJ's narrative discussion violated SSR 06-03p, Plaintiff must still show that the alleged error prejudiced her disability claim.  *See McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 838 (N.D. Tex. 2008) ("A violation of a ruling . . . may [] constitute error warranting reversal and remand when an aggrieved claimant shows prejudice resulting from the violation.") (citation omitted); *see also Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. 1981) ("Should an agency in its proceedings violate its rules and prejudice result, the proceedings are tainted and any actions resulting from the proceeding cannot stand.") (citations omitted).

In the Fifth Circuit, a claimant is prejudiced when the procedural improprieties "cast into doubt the existence of substantial evidence to support the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988).  Here, Plaintiff argues, in essence, that the ALJ's failure to consider and discuss her case manager's testimony prejudiced her claim because the testimony "was relevant and important to the evaluation of Plaintiff's mental health impairments and their resulting limitations."  (Pl. Br. at 6.)

---

CIV. A. 07-1328, 2008 WL 4450282, at *6 (W.D. La. Sept. 30, 2008) ("Moreover, the ALJ is required to consider evidence from 'other sources' when evaluating an 'acceptable medical source's' opinion.") (citing to SSR 06-03P).

"After careful consideration of the entire record," the ALJ determined that Plaintiff had the RFC to perform a full range of work at all exertional levels and "understand, remember, and carry out detailed but not complex instructions." (R. at 25.)  At step four, he concluded that Plaintiff could perform her past relevant work as a customer service telephone clerk.  (R. at 28.)[11]  In assessing Plaintiff's mental RFC, the ALJ acknowledged Plaintiff's testimony that she was unable "to follow directions, concentrate, and focus"; had "racing thoughts of people, activities, and inventions"; and "was treated by a psychiatrist in 2005 for thoughts of suicide and depression."  (R. at 26, 41–42, 44.)  He found that Plaintiff "appear[ed] to be sincere and genuine regarding the pain and limitations" she claimed to experience, but that her allegations were "simply outside of the range of reasonable attribution according to the medical opinions of record."  (R. at 26–27.)

The ALJ considered important Dr. McClure's (a psychological expert) opinions in his interrogatories dated July 28, 2011, and gave them "significant weight."  (*Id.*)  Specifically, Dr. McClure opined that Plaintiff had mild limitations in her activities of daily living, social functioning, and maintaining concentration persistence, and pace.  (R. at 519.)  He concluded that Plaintiff had the mental RFC to understand, remember, and carry out detailed but not complex instructions.  (*Id.*)

In his narrative discussion, the ALJ also referenced and implicitly adopted the consultative opinions of Dr. Germain, an SAMC, in her PRTF and mental RFC assessment dated June 14, 2010. (R. at 27, 383–99.)  In the PRTF, Dr. Germain opined that Plaintiff had mild limitations in her activities of daily living and social functioning and had moderate limitations in maintaining

---

[11]  Even though the ALJ's step four finding contravened the VE's testimony that Plaintiff could not perform any of her past relevant work (R. at 59), it was not erroneous because the Fifth Circuit has held that an ALJ need not consult vocational testimony at step four.  *See Harper v. Sullivan*, 887 F.2d 92, 97 (5th Cir. 1989) ("[The ALJ] specifically found that [the claimant] was capable of performing [his] past relevant work . . . The lack of expert testimony therefore be[came] irrelevant.") (citation omitted); *Williams v. Califano*, 590 F.2d 1332, 1334 (5th Cir.1979) ("Vocational testimony is not necessary if the [ALJ] concludes that a claimant [can] return to his former occupation.").

concentration, persistence, and pace.  (R. at 393.)  In the mental RFC assessment form, Dr. Germain opined that Plaintiff was not significantly limited in 14 work-related mental abilities, including the ability to understand, remember, and carry out very short and simple instructions, and was moderately limited in 6 abilities, including the ability to understand, remember, and carry out detailed instructions.  (R. at 397–98.)  She concluded that Plaintiff had the mental RFC to understand, remember, and carry out detailed, non-complex instructions, attend and concentrate for extended periods, accept instructions, and respond appropriately to changes in a routine work setting. (R. at 399.)

The ALJ's written opinion did not mention the case manager's testimony.  (*See* R. at 18–29.) At the hearing, the case manager testified that she had been "involved" in Plaintiff's treatment at ABC Behavioral for the past year and a half.  (R. at 69.)  Based on her interactions with Plaintiff, she opined that Plaintiff had difficulty concentrating, focusing, and communicating effectively.  (R. at 67–69.)  She stated that Plaintiff was "withdrawn" and often isolated herself from others.  (R. at 69.)  In her opinion, Plaintiff was "more manic than depressed," and her mania was manifested by symptoms of frustration, anger, and panic attacks.  (R. at 70, 73.)  During her panic attacks, Plaintiff was unable to communicate, had difficulty breathing, felt as if she was having a heart attack, and sometimes went to the emergency room because she felt overwhelmed.  (R. at 73.)  The case manager also opined that Plaintiff had OCD relating to her cleaning and communication habits.  (R. at 70.)  She stated that Plaintiff had auditory and visual hallucinations.  (R. at 76.)  She believed that Plaintiff lacked interpersonal skills and was paranoid in large group settings.  (R. at 76, 80.)  In her opinion, it was difficult to find the right medications to treat Plaintiff's condition in part because she could not properly describe her symptoms and experienced serious side-effects.  (R. at 74–76.)

Notably, many of the case manager's statements conflicted with other evidence in the record. For example, during her numerous consultations between January 12, 2009 and August 2, 2011, Dr. Trulson, Plaintiff's treating psychiatrist, indicated that Plaintiff's attention, concentration, and memory were "intact"; her thought process and content were "well-organized" and "goal oriented"; and her insight and judgment were either "good" or "intact." (*See, e.g.*, R. at 348–50, 418–19, 446–51, 493–97.) Similarly, on March 4, 2010, clinician Johnson from Metrocare indicated that Plaintiff was alert and oriented, her memory was intact, and her attention was normal. (R. at 370.)

Moreover, in her February 16, 2011 questionnaire, Dr. Trulson indicated that Plaintiff had no recurrent obsessions or compulsions that were "a source of marked distress." (R. at 418.) This was at odds with the case manager's testimony that Plaintiff had "OCD" issues regarding her cleaning and communication habits. (R. at 70, 81, 418.) Similarly, Dr. Trulson's opinion that Plaintiff showed no "seclusiveness or autistic thinking" conflicted with the case manager's testimony that she was withdrawn and isolated and "lacked interpersonal skills." (*See* R. at 69–70, 418.) Dr. Trulson's notation that she had no hallucinations or delusions discredited the case manager's statement that she experienced visual hallucinations about insects crawling on her skin and heard voices on a daily basis. (R. at 70, 76, 418.) While the case manager stated that Plaintiff had panic attacks three or four times a week and sometimes went to the emergency room because she felt overwhelmed, Dr. Trulson indicated in the form that Plaintiff had no "recurrent severe panic attacks manifested by . . . [a] sense of impending doom occurring on the average of at least once a week." (R. at 72–73, 418.)

Based on the evidence of record, Dr. McClure and Dr. Germain opined that Plaintiff could understand, remember, and carry out detailed but non-complex instructions. (R. at 82, 399, 519.)

Dr. Germain further opined that Plaintiff could attend and concentrate for extended periods.  (R. at 399.)  The consultants' opinions contradicted the case manager's testimony that Plaintiff had "poor concentration" and difficulty focusing.

As the fact-finder, the ALJ could reject the case manager's testimony if he found it to be inconsistent with other evidence in the record, including Dr. Trulson's treating observations.  *See Newton*, 209 F.3d at 452.  It was also proper for the ALJ to accept Dr. McClure's and Dr. Germain's consultative RFC findings because the ALJ may accept a consulting physician's opinion that is well-supported over any treating source's opinion.  *See Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir.1981) (holding that the ALJ "was justified in accepting the opinion of [a non-treating, consultative physician] . . . that was supported by the evidence, and in rejecting the [opinion] of . . . a treating physician that was contrary to the evidence") (citing to 20 C.F.R. § 404.1526).  Plaintiff has not shown that she was prejudiced by the ALJ's failure to explicitly acknowledge the case manager's testimony, and his failure to do so does not cast doubt unto the existence of substantial evidence supporting his mental RFC assessment.  Remand is therefore not required on this issue.

**D.**      **Treating Physician Rule**

Plaintiff next argues that remand is required because the ALJ rejected Dr. Trulson's treating opinion evidence and observations without applying the proper legal standards.  (Pl. Br. at 6–8.)

The Commissioner is entrusted to make determinations regarding disability, including weighing the evidence in the record.  20 C.F.R. §§ 404.1520b(b) and 404.1527(c) (2012).  Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater

weight to opinions from a treating source.[12] 20 C.F.R. § 404.1527(c)(2).  When "a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give that opinion controlling weight. *Newton*, 209 F.3d at 455 (citing 20 C.F.R. § 404.1527(c)(2)).  If controlling weight is not given to a treating source's opinion, the Commissioner generally applies six factors[13] in deciding the weight given to this and all other medical opinion evidence in the record. *Id.*

Nevertheless, a treating physician's opinion may be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence."  *Id.* at 455–56.  A factor-by-factor analysis is also unnecessary where "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another", or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion."  *Id.* at 458.

In discussing the evidence of record, the ALJ acknowledged Plaintiff's treatment for bipolar disorder and polysubstance disorder at ABC Behavioral.  (R. at 21.)  He referenced Dr. Trulson's numerous mental status exams showing that Plaintiff was "well groomed, friendly, with intact

---

[12]  A treating source is the claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has, or has had, an ongoing treatment relationship with the claimant.  20 C.F.R. § 404.1502 (2012).

[13]  These factors are: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion."  20 C.F.R. § 404.1527(c)(1)–(6).

attention and concentration, congruent affect, well-organized thought process, intact memory, fair insight, and fair judgment." (*Id.*) He noted Plaintiff's medical compliance and her complaint to Dr. Trulson on June 8, 2011, that her medication made her feel "sedated." (R. at 21, 445.)

The ALJ also pointed to Metrocare treatment notes from March 2010 showing that Plaintiff had "symptoms of sad mood, social isolation, racing thoughts, mood sings, and hopelessness." (R. at 21, 475.) He found important clinician Johnson's notations that Plaintiff's affect was euthymic, her memory was intact, she was oriented, and she had normal thought processes, fair insight and judgment, and impulse control. (R. at 21, 370.)

The ALJ expressly referenced Dr. Trulson's February 26, 2011 questionnaire, including her GAF score of 50. (R. at 21, 417.) As noted, Dr. Trulson opined that Plaintiff did not experience 43 of the 56 listed symptoms, had no recurrent obsessions or compulsions, showed no signs of "seclusiveness or autistic thinking," had no hallucinations or delusions, and had no "recurrent severe panic attacks." (418.) She also indicated that Plaintiff's orientation, attention, concentration, and memory were "intact," her insight and judgment were good, her motor activity and speech were normal, and her affect was congruent. (R. at 419.)

The ALJ's narrative discussion does not specifically reference Dr. Trulson's August 3, 2011 disability letter. (*See* R. at 18–29.) In her letter, Dr. Trulson stated that she had treated Plaintiff since November 2008. (R. at 355.) Although she initially diagnosed Plaintiff with bipolar disorder, she now believed that "Schizoaffective Disorder, Bipolar type" was the most appropriate diagnosis. (*Id.*) Among Plaintiff's symptoms, Dr. Trulson listed "hallucinations, anxiety, poor concentration, and insomnia." (*Id.*) She explained that it was difficult to treat Plaintiff's symptoms because she experienced "intolerable side effects to many medications." (*Id.*) Lastly, Dr. Trulson opined that

-24-

it was "highly unlikely" that Plaintiff could obtain or maintain employment "at any skill level" due to her ongoing symptoms, and she did not anticipate that Plaintiff would gain "substantial restoration of function." (*Id.*)

The ALJ was entitled to reject Dr. Trulson's conclusion that Plaintiff's mental illness precluded her from obtaining or maintaining competitive employment because a determination of disability is not a medical opinion, but rather a legal conclusion that is reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(e); *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003). Even if considered, Dr. Trulson's opinion was at odds with Dr. Cartwright's examining opinion from that same month that Plaintiff should continue to seek employment to "provide for herself financially." (R. at 531.) The ALJ could also reject Dr. Trulson's statement in her disability letter that Plaintiff suffered from hallucinations and poor concentration without performing a factor-by-factor analysis because there was competing, first-hand medical evidence, including her own February 26, 2011 questionnaire and numerous mental status exams that contradicted those findings. In the questionnaire, Dr. Trulson indicated that Plaintiff did not have any hallucinations or delusions. (R. at 418–19.) She also indicated on her numerous mental status exams that Plaintiff's memory, attention, and concentration were either intact or good. (*See, e.g.*, 370, 418–19, 505–06.) Dr. Trulson's opinion about Plaintiff's poor concentration was also contradicted by a clinician Johnson's observations in March 2010 that Plaintiff was alert and oriented, her memory was intact, and her attention was normal. (R. at 370, 430.)

The ALJ's evaluation of Dr. Trulson's treating observations and opinions was not erroneous and is supported by substantial evidence in the record. Accordingly, remand is also not required on

this issue.[14]

### III.  CONCLUSION

The Commissioner's decision is wholly **AFFIRMED.**

**SO ORDERED** on this 25th day of April, 2014.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[14] Since Plaintiff has not met her "very high burden of establishing disability without any doubt," her request for benefits is denied.